1  JAMES R. SHIVELY
   United States Attorney
2  WILLIAM H. BEATTY
   Assistant U. S. Attorney
3  Post Office Box 1494
   Spokane, WA 99210-1494
4  Telephone: (509) 353-2767

5  R. JUSTIN SMITH
   Environment & Natural
6  Resources Division
   U.S. Department of Justice
7  P.O. Box 4390
   Ben Franklin Station
8  Washington, DC  20044-4390
   Telephone:  (202) 514-9369
9  Facsimile:  (202) 514-4231

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

SEP 0 6 2000

JAMES W. LARSEN, CLERK
_____DEPUTY
SPOKANE, WASHINGTON

10        UNITED STATES DISTRICT COURT
11        EASTERN DISTRICT OF WASHINGTON

12

13 SAVE OUR SUMMERS, et al.,

14          Plaintiffs,                    NO. CS-99-269-RHW

15     vs.                                 BRIEF AMICUS CURIAE
                                           OF THE UNITED STATES
16 STATE OF WASHINGTON
   DEPARTMENT OF ECOLOGY,

17          Defendant.

18

19

20        **INTEREST OF THE UNITED STATES**

21        By Order dated December 6, 1999, this Court requested that the United

22 States participate as amicus curiae to address (1) whether the comprehensive

23 statutory and regulatory scheme of the Clean Air Act, 42 U.S.C. § 7401 et seq.

24 ("CAA"), including private remedies, forecloses plaintiffs' claims under the

25 Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ("ADA") and

26 the Rehabilitation Act of 1973, 29 U.S.C. § 791 et seq. ("RA"), and (2) whether

27

28 BRIEF AMICUS CURIAE OF THE UNITED STATES - 1
   P00906pp.jsa



1  the objectives and remedies of the ADA and RA can be reconciled with the CAA's

2  standards, which are the result of "compromise and consensus." Since that time,

3  the parties have been engaged in settlement discussions. Because the parties have

4  not succeeded in reaching agreement, the United States now files this brief as

5  amicus curiae.

6       The Department of Justice has authority to interpret and enforce the ADA

7  and the RA. In addition, the Environmental Protection Agency, in cooperation

8  with the individual states, has primary responsibility for the implementation and

9  enforcement of the CAA; the Department of Justice also has authority to enforce

10  the CAA. EPA has authority to set National Ambient Air Quality Standards, 42

11  U.S.C. § 7409 ("NAAQS"), and to approve state plans implementing those

12  standards. 42 U.S.C. § 7410(k). Accordingly, the United States has a strong

13  interest in addressing the interrelationship of these statutes. The United States

14  urges the Court to find that the two statutes should be read harmoniously, so that

15  this Court has jurisdiction to hear plaintiffs' ADA claims; however, the remedies

16  available under the ADA may need to be modified to avoid conflict with the CAA

17  scheme.

### STATEMENT

19       Plaintiffs are a nonprofit organization, Save Our Summers, and two

20  children, one with serious asthma and one with cystic fibrosis. The children state

21  that they suffer serious health problems from the effects of seasonal wheat stubble

22  burning in the vicinity of their homes. The smoke that results from burning

23  assertedly renders them unable to avail themselves of various public facilities,

24  including schools and roads. Instead, they must either remain at home or leave the

25  region altogether.

26

27

28

Wheat stubble burning is a method that farmers in eastern Washington State use to clear their fields. Some farmers choose to use this method because it effectively removes stubble and vegetation, while also eliminating pests (thus reducing the need to use pesticides). Burning is fairly widespread in the area, and is performed by hundreds of farmers each season. The burning produces large quantities of smoke.

The State of Washington has imposed a permitting program on crop burning. Under this program, farmers must apply in advance for a permit to burn crop stubble. The State will determine whether burning is "reasonably necessary to carry out the enterprise;" "[a] farmer can show it is reasonably necessary when it meets the criteria of the best management practices and no practical alternative is reasonably available." Wash. Admin. Code § 173-430-040. If the State or its delegatees conclude that these conditions are met, it will grant a permit. A permit also "must be conditioned to minimize air pollution" and may be denied "during periods of adverse meteorological conditions." Id. See also Plaintiffs' Memorandum of Authorities Supporting Motion for Reconsideration, Exh. C (specimen of permit).

Plaintiffs brought suit against the Washington State Department of Ecology under the ADA and the RA, seeking a preliminary injunction against the issuance of further crop burning permits. This Court denied the injunction, tentatively concluding that it lacked jurisdiction to consider the suit. After plaintiffs moved for reconsideration, this Court issued an order providing the United States an opportunity to file a brief as amicus curiae.

# STATUTORY AND REGULATORY BACKGROUND

A.    **The Americans with Disabilities Act and the Rehabilitation Act**

Title II of the ADA generally prohibits discrimination on the basis of disability by public entities.  The nondiscrimination provision states that:

> . . . no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.  Section 504 of the Rehabilitation Act contains a similar prohibition that states:

> [n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a).

Title II has broader applicability than Section 504, as it applies to all State activities and Section 504 applies only to programs or activities that receive Federal financial assistance.  See 42 U.S.C. § 12131(1)(B); 29 U.S.C. 794(a); Pennsylvania Department of Corrections v. Yeskey, 118 S. Ct. 1952, 1954 (1998) (title II covers State prisons); Armstrong v. Wilson, 124 F.3d 1019, 1023 (9th Cir. 1997), cert. denied, 524 U.S.937 (1998) (finding that title II encompasses "all facets" of state government).  The broad coverage of title II is supported by the ADA's legislative history.  H.R. Rep. No. 485(II), 101st Cong., 2d Sess., at 84 (1990) ("[t]he Committee has chosen not to list all the types of actions that are included within the term 'discrimination,' as was done in titles I and III, because this title essentially simply extends the anti-discrimination prohibition embodied in section 504 to all actions of state and local governments.").[1]

_____

[1] Section 504 now defines a covered "program or activity" to include "all of

1  Title II requires public entities to make reasonable modifications to their
2  usual policies, practices, and procedures where necessary to avoid discrimination
3  on the basis of disability. See 42 U.S.C. § 12131(2)(defining "qualified individual
4  with a disability" as "an individual with a disability who, with or without
5  reasonable modifications to rules, policies, or practices . . . meets the essential
6  eligibility requirements for the receipt of services or the participation in programs
7  or activities provided by a public entity"); 28 C.F.R. § 35.130(b)(7) (1999)
8  (requiring reasonable modifications when necessary to avoid discrimination).[2]
9  Reasonable modifications in policies, practices, or procedures are required in
10  order to avoid discrimination, "unless the public entity can demonstrate that
11  making the modifications would fundamentally alter the nature of the service,
12  program, or activity." Id. The Supreme Court has suggested that analysis of a

---

14  the operations of" a department, agency, or other instrumentality of a State or local
15  government receiving Federal financial assistance. 29 U.S.C. § 794(b).

16  [2] The Attorney General was assigned the duty to issue regulations
17  implementing title II. 42 U.S.C. 12134(a). With limited exceptions not relevant
18  herein, Congress specified that those regulations were to be consistent with titles I
19  and III of the ADA and with the coordination regulations issued under section
20  504. 42 U.S.C. § 12134(b). The Supreme Court recently noted that "[b]ecause the
21  Department [of Justice] is the agency directed by Congress to issue regulations
22  implementing Title II, . . . its views warrant respect. . . . [T]he well-reasoned
23  views of the agencies implementing a statute constitute a body of experience and
24  informed judgment to which courts and litigants may properly resort for
25  guidance." Olmstead v. L.C., 527 U.S. 581, 597-598 (1999) (internal quotations
26  and citations omitted).

1  defense of fundamental alteration would include consideration of "undue

2  hardship" elements such as the costs of the modification, the budget of the

3  program or activity, and the overall size and type of the program.  See Olmstead v.

4  L.C., 527 U.S. 581, 606 n.16 (1999).  This reasonableness standard also applies to

5  the section 504 claim.  Alexander v. Choate, 469 U.S. 287, 300, n. 20 (1985).[3]

6  B.    **The Clean Air Act**

7        1. General Framework

8        The provisions of the CAA that are most relevant to this case are those

9  relating to the establishment and attainment of the NAAQS.[4]  Under the NAAQS

10  scheme, "the States and the Federal Government [are] partners in the struggle

11  against air pollution."  General Motors Corp. v. United States, 496 U.S. 530, 532

12  (1990).  See also Commonwealth of Virginia v. EPA, 108 F.3d 1397, 1406-09

13  (D.C. Cir. 1997).  EPA first sets the national ambient air quality standards for

14  specific pollutants at levels necessary to protect public health and welfare.  Then

15  States have the primary responsibility for selecting and implementing the pollution

---

17        [3] Given this similarity of standards, and for ease of discussion, subsequent

18  text that discusses the nondiscrimination statutes in greater detail generally will

19  focus only on the text and analysis of the ADA.

20        [4] The CAA has several other major components, addressing, inter alia,

21  pollution from new stationery sources, 42 U.S.C. § 7411, hazardous air pollutants,

22  42 U.S.C. § 7412, mobile sources, 42 U.S.C §§ 7521-7590, acid rain deposition,

23  42 U.S.C. §§ 7651-7661, and stratospheric ozone protection, 42 U.S.C. § 7671.

24  The operation of these provisions differs significantly from that of the NAAQS,

25  and the discussion in this brief is not necessarily applicable to those statutory

26  provisions.

27

28  BRIEF AMICUS CURIAE OF THE UNITED STATES - 6
P00906pp.jsa

1    control measures necessary to attain the NAAQS within their boundaries; they do

2    so by establishing State Implementation Plans ("SIPs"). Only if a State fails

3    regarding its obligations with respect to these SIPs can EPA promulgate a Federal

4    plan for the area in question. 42 U.S.C. § 7410(c).

5         Sections 108 and 109 of the CAA, 42 U.S.C. §§ 7408, 7409, authorize EPA

6    to establish, review and revise NAAQS. After an extensive review of the

7    scientific literature, EPA is to promulgate "primary" and "secondary" NAAQS to

8    protect against "adverse" health and welfare effects for specific pollutants.

9    § 7409(a)(1), (b), (d). "Primary" standards are set at levels which protect public

10   health with "an adequate margin of safety." EPA must review the scientific

11   literature with respect to NAAQS  for a pollutant at least once every five years,

12   and make any revisions and promulgate any new standards that may be

13   appropriate. § 7409(d)(1).[5]

14        Once a NAAQS is set, each State has primary responsibility to ensure that

15   areas within its borders attain the NAAQS. Within 3 years of promulgation of a

16   new or revised NAAQS, EPA must designate areas as meeting ("attainment") or

17   not meeting ("nonattainment") such standards. § 7407(d)(1)(B). For each

18   nonattainment area, the State is to submit to EPA SIPs that contain control

19   measures necessary to reduce air pollution so that the area will attain the NAAQS.

20   States generally have 3 years from designation to submit such plans to EPA for

21   approval. § 7502(b). The plans are to provide for attainment "as expeditiously as

22

23

24   ----------

25   [5] "Secondary" standards are "requisite to protect the public welfare from any

26   known or anticipated adverse effects." 42 U.S.C. § 7409(b)(2). For each criteria

27   pollutant, the primary and secondary standards are identical.

28   BRIEF AMICUS CURIAE OF THE UNITED STATES - 7
     P00906pp.jsa

1  practicable, but no later than 5 years from the date . . . of designation."

2  § 7502(a)(2).[6]

3          EPA's discretion is limited in the approval process.  See Union Electric Co.

4  v. EPA, 427 U.S. 246, 269 (1976) ("Congress plainly left with the States . . . the

5  power to determine which sources would be burdened by regulation and to what

6  extent"); Train v. Natural Resources Defense Council, Inc., 421 U.S. 60, 79 (1975)

7  (EPA has "no authority to question the wisdom of a State's choices of emission

8  limitations if they are part of a plan which satisfies the standards of § 110(a)(2)").

9  Once EPA approves a SIP, it becomes enforceable Federal law.  § 7413(a).

10  Moreover, when a previously designated nonattainment area has monitoring data

11  demonstrating that it is attaining the NAAQS, the area may be redesignated

12  "attainment."  To qualify for redesignation, the State must agree to continue to

13  implement its SIP, submit a plan for maintaining the NAAQS, and meet several

14  other requirements.

15          In the present case, the pollutant of concern appears to be particulate matter

16  ("PM").  EPA has two different sets of ambient standards for PM -- one set of

17  standards for PM10 (particles 10 microns and smaller) and one set of standards for

18  PM2.5 (particles 2.5 microns and smaller).  Some areas in the State of

19  Washington, including certain areas in which crop burning occurs, have been

20  designated nonattainment for PM10.  56 Fed. Reg. 56,694 (Nov. 6, 1991).  In

21  1993, EPA approved (in part) a SIP submitted by the State of Washington which

22

23

24

25          [6] EPA has authority to grant limited extensions under certain

26  circumstances; also, the Act provides different deadlines for certain standards not

27  relevant here.

28  BRIEF AMICUS CURIAE OF THE UNITED STATES - 8
    P00906pp.jsa

1  included provisions relating to PM10 emissions from outdoor burning.  58 Fed
2  Reg. 4578 (Jan. 15, 1993); WAC 173-425 (1990).

3      The United States is in the initial stages of controlling PM2.5.  EPA set a
4  separate standard for PM2.5 for the first time in July 1997.[7]  Pursuant to the
5  Transportation Equity Act for the 21st Century ("TEA-21"), Pub. L. No. 105-178,
6  112 Stat. 463 (codified at 42 U.S.C. § 7407 note), and to a Presidential
7  Memorandum issued when the PM2.5 standards were set, 62 Fed. Reg. 38,421
8  (July 18, 1997), areas will not be designated as attainment or nonattainment until
9  2003 to 2005,[8] which means that state plans to attain the PM-2.5 standard would
10  not be required until 2006 to 2008.  State plans will have to demonstrate that they
11  are attaining the PM-2.5 NAAQS as expeditiously as practicable.  Under the CAA,

12

13  [7] The July 1997 standard for PM2.5 was challenged in court.  The Court of
14  Appeals for the District of Columbia Circuit remanded, but did not vacate, the
15  standard based on constitutional concerns.  The government sought, and the
16  Supreme Court granted, certiorari.  American Trucking Ass'n, Inc. v. EPA, 175
17  F.3d 1027 (D.C. Cir. 1999), rehearing granted in part and denied in part, 195 F.3d
18  4, cert. granted Browner v.American Trucking Ass'n Inc., 120 S.Ct. 2003
19  (May 22, 2000) and American Trucking Ass'n. v. Browner, 120 S.Ct. 2193 (May
20  30, 2000).

21  [8] TEA-21 required the EPA to ensure that the PM-2.5 monitoring network
22  was established by December 31, 1999. § 6102(b).  It then required that governors
23  submit recommended designations 1 year after receipt of 3 years of monitoring
24  data, and provided that EPA was to make the designation for a state by
25  December 31, 2005 or 2 years from a governor's receipt of the monitoring data,
26  whichever date was earlier.  § 6102(c).
27

28  BRIEF AMICUS CURIAE OF THE UNITED STATES - 9
   P00906pp.jsa

1  the attainment dates could not be set later than 2013 to 2015 (unless further
2  extensions are granted).

3      2. Federal Activities Addressing Crop Stubble Burning

4      Although EPA does not directly regulate agricultural burning under the
5  CAA, the federal government is involved in helping States decide whether and
6  how they will regulate burning to attain and maintain the PM NAAQS.  Under the
7  CAA, for certain PM10 nonattainment areas, States may as a practical matter need
8  to include in their SIPs control measures for agricultural operations that contribute
9  to ambient concentrations of PM10.  EPA is in the process of preparing guidance
10 about what control measures would be acceptable.  In preparing that guidance,
11 EPA intends to take into account recommendations from the Department of
12 Agriculture's ("USDA's") Agricultural Air Quality Task Force.  This body, which
13 includes industry representatives and other experts in the fields of agriculture and
14 air quality, was established as a result of legislation, enacted in 1996, in which
15 Congress required USDA to establish an advisory body "to address agricultural air
16 quality issues." 7 U.S.C. § 5405(d)(1).  The legislation also included a
17 Congressional finding that "recommendations that may be issued by any Federal
18 agency to address air pollution problems related to agriculture or any other
19 industrial activity should be based on sound scientific findings that are subject to
20 adequate peer review and should take into account economic feasibility." 7 U.S.C.
21 § 5405(a)(4).  The Agricultural Air Quality Task Force has sent to USDA
22 recommendations regarding a policy on agricultural burning, which USDA has
23 recently forwarded to EPA.  After reviewing these recommendations, EPA intends
24 to develop proposed guidance and solicit public comment on it before issuing final
25 guidance to the States.

26
27
28

BRIEF AMICUS CURIAE OF THE UNITED STATES - 10
P00906pp.jsa

## SUMMARY OF ARGUMENT

Plaintiffs' ADA and RA claims are not barred by the CAA, notwithstanding the CAA's extensive remedial scheme.[9] These two statutory schemes can be interpreted in a manner that promotes both statutes' objectives; thus, neither scheme should be construed to displace the other.

The principles set forth in Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1, 19-21 (1981), are not controlling here. First, 42 U.S.C. § 1983 is distinguishable from the ADA. Section 1983 provides a vehicle to seek compliance with the standards set forth in a given statute, but the ADA provides rights and remedies that are distinct from other federal statutes. Second, the Supreme Court itself has significantly limited the application of Sea Clammers in the context of section 1983 actions.

While plaintiffs' claims may not be barred, the Court should take into account the statutory scheme of the federal Clean Air Act, as well as the State's own Clean Air Act, in determining what remedial relief is available under the ADA. The ADA and the RA require reasonable modifications, but do not require modifications that would constitute a fundamental alteration of an existing program. See Olmstead v. L.C., 527 U.S. 581, 603-607 (1999); Alexander v. Choate, 469 U.S. 287, 300, n. 20 (1985). In assessing what constitutes a "fundamental alternation," a court must examine the program in issue, including its policies and objectives. Because the CAA sets forth the Federal framework for air pollution control, in assessing what constitutes a fundamental alteration, the

_____

[9] Except where stated otherwise, Plaintiffs' ADA and RA claims will be referred to collectively as the "ADA claims."

1  court must consider the CAA's policies and objectives as well as the State's clean
2  air and agricultural burning laws.

3      Three elements of the Federal scheme are especially relevant to this
4  analysis. The CAA establishes nationwide standards for air quality; it provides for
5  State discretion in achieving the goals of the Act; and it generally provides States
6  with substantial amounts of time in which to comply with the requirements of the
7  Act. The Court should consider these three elements of the statutory scheme in
8  determining whether particular remedies are reasonable modifications or
9  fundamental alterations. The Court should also consider the policies and purposes
10 of the State Clean Air Act. That Act seeks to permit crop burning where there is
11 no practicable alternative, while minimizing adverse health effects.

**ANALYSIS**

A.   **This Court Has Jurisdiction to Consider Plaintiffs' Americans With Disabilities Act and Rehabilitation Act Claims**

14     The question whether this Court has jurisdiction to consider plaintiffs' ADA
15 claims turns on ordinary principles of statutory interpretation. Under those
16 principles, one remedy created by Congress is not lightly construed to displace
17 another. "[W]hen two statutes are capable of co-existence, it is the duty of the
18 courts, absent a clearly expressed congressional intention to the contrary, to regard
19 each as effective." Morton v. Mancari, 417 U.S. 535, 551 (1974).

20     In some instances, it is not possible to give effect to one statute without
21 thwarting the intent of Congress in enacting another. When this occurs, the court
22 must determine which of the statutes Congress intended should be applicable. The
23 latter task only becomes necessary, however, if there is no way of harmonizing the
24 two statutes. "[T]o the extent that statutes can be harmonized, they should be."
25 United States v. Trident Seafoods Corp., 92 F.3d 855, 862 (9th Cir. 1996); see also
26 2A Sutherland Statutory Construction § 51.05 (4th ed. 1984) ("Where one statute

1  deals with a subject in general terms, and another deals with a part of the same
2  subject in a more detailed way, the two should be harmonized if possible; but if
3  there is any conflict, the latter will prevail, regardless of whether it was passed
4  prior to the general statute, unless it appears that the legislature intended to make
5  the general act controlling."). The Court's first task is thus to harmonize the two
6  statutes; the feasibility of harmonizing them will often turn on the particular
7  circumstances in which the case arises.

8      This Court previously concluded that it did not have jurisdiction to hear
9  plaintiffs' claims under the ADA and the RA, in light of the comprehensive nature
10 of the federal scheme for the regulation of air quality.  It appears based on the
11 facts of this case that Congress's purposes in enacting the CAA can be adequately
12 taken into account in selecting a remedy under the ADA, as explained in more
13 detail in part B, infra.  Thus, the Court need not have determined whether, had
14 there been a true conflict between the statutory schemes on the facts of this case,
15 the ADA or CAA scheme would have yielded.  Because the two statutes can be
16 successfully harmonized, according to ordinary principles of statutory construction
17 there is no occasion to inquire which statute Congress intended should be
18 controlling.[10]

19

20      [10] Section 12201(b) of the ADA also suggests that Congress generally
21 intended that the ADA coexist with remedies, rights and procedures under other
22 statutory schemes.  See Watkins v. J & S Oil Co., 977 F. Supp. 520, 524 n.2
23 (D. Me. 1997) (in discussing the relationship between the Family Medical Leave
24 Act and the ADA, citing section 12201(b), and stating that a disabled employee is
25 "simultaneously protected" by the two statutes); Wood v. County of Alameda, 875
26 F. Supp. 659, 664 (N.D. Cal. 1995) (finding that this provision "is intended to
27
28 BRIEF AMICUS CURIAE OF THE UNITED STATES - 13
   P00906pp.jsa

1    This case is not governed by the analysis applied by the Supreme Court in
2    Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1,
3    19-21 (1981).  In Sea Clammers, the Court considered whether plaintiffs could
4    bring a claim under 42 U.S.C. § 1983 to recover damages for a violation of the
5    Clean Water Act ("CWA").  Plaintiffs sought to enforce, pursuant to section 1983,
6    the standards set forth in the CWA even though the CWA had its own statutory
7    enforcement mechanisms.  The Court found that relief pursuant to section 1983
8    was not available because Congress had already created a "sufficiently
9    comprehensive" remedial scheme under the CWA, and to allow claims under
10   section 1983 would circumvent Congress's decision to allow only certain remedies
11   and not others when implementing the CWA.  Id. at 20.

12       The Supreme Court's analysis in Sea Clammers applies only to cases
13   involving actions brought under section 1983, and should not be applied to claims
14   under the ADA or the RA.  Section 1983 provides a vehicle for plaintiffs to assert
15   violations of federal law; it does not create a substantive right that exists
16   independent of the statute in issue.  In contrast, the ADA and the RA (and certain
17   other disability discrimination statutes) provide protections against discrimination
18   on the basis of disability that are governed by specific substantive standards and
19   are independent of other federal protections.

20       The Court's analytical approach in Sea Clammers did not inquire into
21   whether section 1983 and the CWA's statutory scheme could be reconciled.
22   Instead, the Court focused its inquiry on the CWA's statutory scheme, and, finding

24   _____

25   ensure that plaintiffs can avail themselves of *both* the applicable rights and
     remedies under the ADA *and* complimentary state rights and remedies") (italics in
26   original).

28   BRIEF AMICUS CURIAE OF THE UNITED STATES - 14
     P00906pp.jsa

1   that scheme to be comprehensive, concluded that Congress intended to foreclose
2   reliance on section 1983 to enforce the CWA.  That analytical approach has not
3   been applied outside of the section 1983 context because section 1983 is unusual
4   in providing an enforcement mechanism for substantive rights defined in another
5   statute, so that in cases involving that provision there are not two distinct statutory
6   schemes to be reconciled.  Here, by contrast, the ADA and RA themselves define
7   both substantive rights distinct from those contained in the CAA, and provide
8   means of enforcing those rights.  In cases like this one, involving potential
9   conflicts between two distinct statutory schemes, the <u>Sea Clammers</u> analysis does
10  not apply; instead, a court should seek to reconcile the two schemes, as explained
11  above.

12      Indeed, the Court has concluded in only one instance besides <u>Sea Clammers</u>
13  that a statute's remedial scheme is so comprehensive as to bar plaintiffs' claims
14  alleging violations of the statute pursuant to section 1983.  See <u>Blessing v.</u>
15  <u>Freestone</u>, 520 U.S. 329, 346-347 (1997) (noting this fact in rejecting assertion
16  that section 1983 provides no avenue for relief for claims challenging Social
17  Security Act); <u>Smith v. Robinson</u>, 468 U.S. 992, 1012-1013 (1984) (finding that
18  comprehensive remedial scheme of Education for Handicapped Act precluded
19  section 1983 claim to enforce the same educational rights).  Even when the <u>Sea</u>
20  <u>Clammers</u> test is applicable, the Court has said that a "difficult showing" is
21  required to demonstrate that Congress intended to divest plaintiffs of the ability to
22  proceed under section 1983.  See <u>Blessing</u>, 520 U.S. at 346.

23  **B.    <u>Identification Of Remedies Under the Americans with Disabilities Act</u>**
        **<u>Must Take Into Account the Purposes and Policies of the Federal And</u>**
24      **<u>State Clean Air Acts</u>**

25      The ADA requires a State or local government to make reasonable
26  modifications to its programs for qualified individuals with disabilities, but not to
27

28

1  fundamentally alter its programs.  See 42 U.S.C. § 12132, 28 C.F.R.

2  § 35.130(b)(7).  As we discuss in more detail below, by adhering to this principle,

3  a court may reconcile any tension or conflict between the Federal Clean Air Act,

4  the State of Washington's Clean Air Act, and the ADA's statutory schemes in its

5  assessment of what, if any, modifications to the State's wheat stubble burning

6  permit scheme are required.  Because of the posture of this case and the limited

7  record before the Court, the United States will not address the appropriateness of

8  any particular proposed remedies or modifications.

9     1.  The ADA's Reasonable Modification/Fundamental Alteration Standard

10       The ADA requires only "reasonable" modifications, and does not require a

11  "fundamental alteration" in a state program.  See Olmstead 527 U.S. at 603-607

12  (stating and applying the "fundamental alteration" standard).  A proposed

13  modification is not required if it results in a fundamental alteration of a program or

14  imposes an undue burden or hardship on the defendant.  See Easley v. Snider, 36

15  F.3d 297, 305 (3d Cir. 1994); see also Olmstead, 527 U.S. at 603-606 & n.16; 28

16  C.F.R. § 35.130(b)(7).[11]  The burden of showing that a particular modification

17

18       [11] Courts examine whether a proposed modification imposes a fundamental

19  alteration to a program or an undue hardship on a defendant based on essentially

20  the same factors.  What constitutes an undue hardship requires a "case-by-case

21  analysis."  Olmstead, 527 U.S. at 606 n.16; see 42 U.S.C. § 12134(b) (Title II

22  ADA regulations shall be consistent with regulations implementing the RA);

23  Helen L.v. DiDario, 46 F.3d 325, 338 (3d Cir. 1995) (rejecting assertions that

24  providing in-home attendant care services would cause a fundamental alteration or

25  undue burden since such services were consistent with the State's own program

26  objectives).

27

28  BRIEF AMICUS CURIAE OF THE UNITED STATES - 16
   P00906pp.jsa

1   amounts to a "fundamental alteration" rests with the defendant.  See ibid.; see also
2   Johnson v. Gambrinus Co., 116 F.3d 1052, 1059 (5th Cir. 1997).

3        "The determination of what constitutes reasonable modification is highly
4   fact-specific, requiring case-by-case inquiry."  Crowder v. Kitagawa, 81 F.3d
5   1480, 1486 (9th Cir. 1996); see Martin v. PGA Tour, Inc., 204 F.3d 994, 999 (9th
6   Cir. 2000) (applying reasonableness standard of Title III of the ADA); Staron v.
7   McDonald's Corp., 51 F.3d. 353, 356 (2d Cir. 1995); Easley, 36 F.3d at 305.
8   Therefore, it ordinarily is inappropriate to make an abstract determination that
9   certain types of modifications either would be reasonable or would amount to
10  fundamental alterations.  Instead, a court must analyze and closely consider the
11  facts of the case at hand, and assess whether a modification for the plaintiff, as
12  opposed to individuals generally, is reasonable or constitutes a fundamental
13  alteration of the program.  See Martin, 204 F.3d at 1001 ("'evidence must focus[]
14  on the specifics of the plaintiff's or defendant's circumstances and not on the
15  general nature of the accommodation'"; quoting Johnson, 116 F.3d at 1060).

16       Assessing the reasonableness of a proposed modification may include
17  considering whether it is effective and whether it is difficult, as a practical matter,
18  to implement.  See Martin, 204 F.3d at 999.  Moreover, if a plaintiff seeks a
19  modification to a statutory or regulatory scheme, the reasonable
20  modification/fundamental alteration inquiry should examine the underlying
21  purposes of the program, rules, and regulations at issue.  See e.g., Easley, 36 F.3d
22  at 303-305.  By examining a program's or regulation's primary purposes and
23  objectives, a court can determine whether these goals would be undermined if the
24  modification were granted.  See Martin, 204 F.3d at 1000  (allowing plaintiff the
25  use of a golf cart was not a fundamental alteration of the nature of the golf
26  competition since walking, and asserted fatigue resulting from walking, were not

27

28  BRIEF AMICUS CURIAE OF THE UNITED STATES - 17
    P00906pp.jsa

1    deemed significant elements of competition); compare Easley, 36 F.3d at 305-306

2    (providing in-home attendant care services to non-alert physically disabled

3    persons would alter essential purposes of the program, which is designed to

4    increase opportunities for independent living, including employment), and

5    Helen L. v. DiDario, 46 F.3d 325, 337-339 (3d Cir. 1995) (in-home attendant care

6    services for physically disabled person currently served in nursing home and

7    segregated from the community would be consistent with, and not fundamentally

8    alter, the objectives of state attendant care program).

9        Thus, the fundamental alteration component of the reasonable modification

10   analysis is not measured in the abstract.  Instead, when dealing with activities of a

11   public entity, the context of the regulatory scheme provides a critical backdrop,

12   and the regulatory body's ability to pursue and achieve the purposes underlying

13   the program or statutory scheme in question must be examined in light of the

14   proposed modification.  Thus, a court must examine whether the proposed

15   modification is consistent with the objectives of the entire program in determining

16   whether a modification is reasonable or a fundamental alteration. See Easley, 36

17   F.3d at 305 (weighing extent to which the proposed modification would shift the

18   focus of the program); Heather K. v. City of Mallard, Iowa, 946 F. Supp. 1373,

19   1389 (N.D. Iowa 1996) (denying summary judgment; requiring assessment of

20   whether a proposed modification to ordinance on backyard burning is reasonable,

21   or fundamentally alters the objectives of the ordinance or imposes an undue

22   hardship on the defendant).[12]

23

24   _____

25       [12] In Heather K., 946 F. Supp. at 1384-1385, the district court cited a letter

     from the Department of Justice that addressed a different set of facts; that letter is

26   not applicable in this case.

27

28   BRIEF AMICUS CURIAE OF THE UNITED STATES - 18
     P00906pp.jsa

1    2.  The Federal and State Clean Air Programs

2        The Court should consider the purposes and structure of the Federal and

3   State clean air regulatory schemes in conducting its reasonable modification/

4   fundamental alternation analysis.  By following this approach, a court may

5   reconcile any tension or conflict between the Federal Clean Air Act, the State of

6   Washington's Clean Air Act, and the ADA's statutory schemes in its assessment of

7   what, if any, modifications to the State's wheat stubble burning program are

8   required.

9        a.  The Purposes and Structure of the Federal Clean Air Program

10       The Federal clean air program as embodied in the CAA is particularly

11  important to the Court's analysis, in light of the Court's obligation to harmonize

12  Federal statutes.  United States v. Trident Seafoods, Corp., 92 F.3d 855, 862 (9th

13  Cir. 1996).  In establishing the national air pollution regulatory scheme, Congress

14  carefully balanced a number of factors; the Court should attend carefully to this

15  balancing in selecting a remedy under the ADA.  We identify three especially

16  important features of the Federal scheme that the Court should consider in

17  analyzing possible modifications to the State program.  These are: (1) the CAA's

18  creation of distinctively national standards for air quality, the NAAQS, which

19  protect sensitive populations, but not the most sensitive individual within a

20  population; (2) the CAA's delegation to the States of discretion to select the means

21  by which to achieve these standards; and (3) the timetables provided under the Act

22  for State compliance with the NAAQS, which give States a substantial amount of

23  time to attain the NAAQS, rather than requiring immediate compliance.  In order

24  to ensure that the ADA and CAA are interpreted harmoniously, the Court should

25  consider each of these three features, and their role in the Washington State

26  agricultural burning permit program, as part of its reasonable modification/

27

28  BRIEF AMICUS CURIAE OF THE UNITED STATES - 19
    P00906pp.jsa

fundamental alteration analysis.  Because of the posture of this case and the limited record before the court, however, the United States will not address the appropriateness of any particular proposed remedies or modifications in light of this framework.

i.  The Act's National Standards.  Section 109(b)(1) of the Clean Air Act requires that EPA set the NAAQS at levels that are "requisite to protect public health" with an "adequate margin of safety."  42 U.S.C.§ 7409(b)(1).  In setting the NAAQS, Congress intended that EPA consider the effects of air pollution on sensitive populations, such as asthmatics.  See Lead Industries Ass'n, Inc. v. EPA, 647 F.2d 1130, 1153 (D. C. Cir. 1980) ("[S]ensitive persons, such as asthmatics . . . are [to be] included within the group that must be protected."); see also American Lung Association v. Browner, 134 F.3d 388, 389 (D.C. Cir. 1998) ("In its effort to reduce air pollution, Congress defined public health broadly.  NAAQS must protect not only average healthy individuals, but also 'sensitive citizens' – children, for example, or people with asthma, emphysema, or other conditions rendering them particularly vulnerable to air pollution.") (quoting S. Rep. No. 91-1196, at 10 (1970)).  However, Congress stated that EPA need not consider the effects of air pollution on the most sensitive individuals within those populations.  See S. Rep. No. 91-1196, at 10 (EPA must consider the effects to a "representative sample of persons comprising the sensitive group rather than to a single person in such a group"), reprinted in 1 Staff of the Senate Comm. On Public Works, 93d Cong., 2d Sess., *A Legislative History of the Clean Air Act Amendments of 1970*"

at 410. (Comm. Print 1974). EPA has promulgated NAAQS for particulate matter, which appears to be the pollutant at issue in this case. See 62 Fed. Reg. 38,652 (1997) (establishing NAAQS for PM10 and PM2.5).[13]

EPA's standards thus establish the appropriate national level of "public health" protection for sensitive subpopulations with regard to these pollutants, recognizing the possibility that some sensitive individuals may continue to experience ill effects as a result of exposure to particulate matter. These standards were set by EPA pursuant to Congressionally delegated authority, and reflect basic scientific and societal choices that are properly reserved to Congress and to EPA. EPA has approved the State of Washington's SIP as consistent with achieving the PM-10 NAAQS.[14]

To the extent that this Court considers, or the plaintiffs seek, remedies that would require the State to achieve air quality standards more protective than those of the NAAQS, the fact that EPA has established the existing NAAQS levels is

---

[13] As already noted, the Court of Appeals for the D.C. Circuit has remanded, but not vacated, the PM-2.5 standards. See supra note 7. Although the same court vacated EPA's revised PM-10 standard, American Trucking, 175 F.3d 1027, 1057, EPA had decided to revoke the preexisting PM-10 standard (codified at 40 C.F.R. 50.6) only on an area-by-area basis. See 62 Fed. Reg. 38,652, 38,701 (July 18, 1997). At the time the standard was vacated, EPA has only done so for one area (Boise, Idaho). Accordingly, the previous PM-10 standard, promulgated in 1987, remains effective in all other areas of the United States.

[14] In 1993, EPA approved a SIP submitted by the State of Washington which included provisions relating to PM10 emissions from agricultural burning. 58 Fed Reg. 4578 (Jan. 15, 1993); WAC 173-425 (1990).

1  relevant to the analysis of whether those remedies constitute reasonable

2  modifications or fundamental alterations.[15]  To the extent that remedies amount to

3  setting new standards for ambient air quality that are more stringent than the

4  federal NAAQS, they might well be in tension with the CAA framework

5  established by Congress, or the standards set by EPA pursuant to Congressionally

6  delegated authority.  The degree of tension would depend on, among other factors,

7  the geographical reach of the remedy.  Remedies that are site specific, localized and

8  otherwise narrowly tailored to the circumstances of the plaintiffs would likely not

9  raise concerns about the NAAQS.  Without commenting on possible remedies

10  specific to this case, those might include such actions as temporal or other

11  limitations on permitted burning in specific areas, provision of prior notice of

12  burning to affected individuals, and other actions that do not conflict with broad

13  federal ambient air quality standards.  On the other end of the spectrum, however, a

14  remedy that effectively established a new ambient air quality standard statewide

15  would for example be a fundamental alteration and therefore would be precluded.[16]

16          ii.  State Discretion.  Second, as we have explained, the Clean Air Act makes

17  the states and federal government regulatory "partners in the struggle against air

18

---

19          [15]  Under the CAA, 42 U.S.C. § 7416, States may, however, set more

20  stringent ambient air quality standards than Federal requirements.  See infra n. 17.

21          [16]  The present case involves the claims of only two individuals; it is

22  unclear to what extent other such claims might be asserted in the future.  The

23  United States believes that it would be important, however, to monitor the

24  aggregate effect of remedies that might be awarded in such cases, and that

25  remedies that could be reasonable standing alone might be fundamental alterations

26  when considered in the aggregate.

27

BRIEF AMICUS CURIAE OF THE UNITED STATES - 22

28  P00906pp.jsa

1  pollution." General Motors Corp., 496 U.S. at 532. With respect to the NAAQS,

2  EPA's role is generally to set national air quality standards and to ensure that these

3  standards are observed. But "Congress plainly left with the States . . . the power to

4  determine which sources would be burdened by regulation and to what extent."

5  Union Electric, 427 U.S. at 269. EPA has "no authority to question the wisdom of

6  a State's choices of emission limitations if they are part of a plan which satisfies

7  the standards of § 110(a)(2)." Train, 421 U.S. at 79.

8  Accordingly, states are given considerable discretion to choose the

9  appropriate mix of control strategies for reaching attainment under the CAA.

10  States may choose varying levels of controls for specific industries or emitting

11  sectors, depending upon the costs of control, the importance of those emitting

12  sectors to the State, and other factors that a State may deem appropriate in

13  determining who should bear the greatest burden of pollution control and how and

14  when they should do so. This discretion is a vital element in the Federal/State

15  balance established by the Act. The extent to which a remedy significantly disturbs

16  that balance is relevant to assessing whether that remedy is a fundamental

17  alteration or a reasonable modification. For example, a remedy that effectively

18  required a given industry sector to shut down statewide would substantially alter

19  the scope of the state's discretion in this regard, and would constitute a

20  fundamental alteration.[17]

---

22      [17] Notably, under the CAA, 42 U.S.C. § 7416, States may elect to set more

23  stringent air quality standards than Federal requirements. Therefore a State might

24  choose on its own to adopt a more stringent ambient air quality standard or to

25  heavily regulate a particular emitting sector, and even to do so in response to the

26  types of concerns raised by plaintiff in this case. Because the Act seeks to provide

28

iii. <u>Time For Compliance</u>. Finally, Congress has established a detailed schedule for State and Federal efforts to attain the NAAQS. After EPA promulgates a new or revised NAAQS, the statute provides three years for EPA to identify attainment and nonattainment areas. 42 U.S.C. § 7407(d)(1)(B). States then have three years in which to submit SIPs for nonattainment areas, CAA § 7502(b), which are to provide for attainment "as expeditiously as practicable" and which EPA can set as late as 10 years after the date of designation (and which EPA can then extend by up to two years). § 7502(a)(2). As discussed above, in 1998, Congress lengthened the timetable further for PM2.5. When States have been unable to meet certain attainment dates for a particular pollutant, Congress has provided even more time for States to achieve the NAAQS.[18]

Thus, in addition to setting an overall level of protection "requisite to protect public health" the overall framework of the CAA sets forth a comprehensive timetable for implementation and ultimate attainment of the air quality standards set forth in the NAAQS. This scheme provides the States with sufficient time to obtain and install appropriate air quality monitoring equipment, generate necessary monitoring data, and then develop, adopt, and implement appropriate plans for attainment. It also provides time for development of new control equipment and technological innovations, and time for sources to install new controls or otherwise change their methods of operation.

---

States with discretion to regulate air quality within their boundaries, however, remedies that would *require* such measures must be tested against the reasonable modification/fundamental alteration standard.

[18] Congress extended the attainment date for ozone for a large number of areas in the 1990 Amendments. CAA § 181.

1    Congress thus intended that States have sufficient time to investigate and

2   implement methods of controlling air pollution that bring the State into attainment

3   while limiting the resulting burden on regulated entities.  Accordingly, the fact that

4   a remedy requires a State to implement changes rapidly should be considered as

5   part of the reasonable modification analysis, particularly if that remedy also

6   involves significant adjustments to the State program.  Moreover, remedies that

7   have the effect of altering specific timetables established pursuant to the CAA

8   would warrant close attention in the reasonable modification analysis.  For

9   example, a remedy that required immediate attainment of a recently promulgated

10   NAAQS would likely constitute a fundamental alteration.  If a remedy were

11   localized, site-specific, and carefully tailored for the affected individuals, it would

12   be more likely that it could require prompt compliance without raising these timing

13   concerns.

14        b.  The Purposes and Structure of the State Clean Air Program

15        This brief focuses on the task of harmonizing the ADA and CAA schemes;

16   the United States has particular expertise with these schemes.  In assessing the

17   State's reasonable accommodation obligation, however, the Court should also

18   consider the purposes and policies underlying the State's clean air program.

19   Although the purposes and policies of the State program have not yet been

20   developed fully by the parties, we provide a preliminary overview in the margin.[19]

21   _____

22        [19]  The wheat stubble burning program that the plaintiffs contest was

23   developed and implemented by the State of Washington under the authority of the

24   State Clean Air Act.  The underlying purposes of that Act include:

25        ... to secure and maintain levels of air quality that protect human
26        health and safety, including the most sensitive members of the
27        population, to comply with the requirements of the federal clean air

1  A more complete analysis will be required when the Court considers particular

2  remedies.

3

4

5  _____

6       act, to prevent injury to plant, animal life, and property, to foster the
7       comfort and convenience of Washington's inhabitants, to promote the
8       economic and social development of the state, and to facilitate the
         enjoyment of the natural attractions of the state.
9

10  Wash.Rev.Code § 70.94.011 (1998).  It also states that "[i]t is the policy of the

11  state that the costs of protecting the air resource and operating state and local air

12  pollution control programs shall be shared as equitably as possible among all

13  sources whose emissions cause air pollution."  Id.

14       As implemented by regulation, the State's agricultural burning permit

15  program seeks to "establish[] controls for agricultural burning in the state in order

16  to minimize adverse health and the environment effects from agricultural burning"

17  and to develop "economically feasible alternative methods to agricultural

18  burning."  Wash. Admin. Code § 173-430-010 (1999).  The permit program

19  regulations further provide that "[a]gricultural burning is allowed when it is

20  reasonably necessary to carry out the enterprise.  A farmer can show it is

21  reasonably necessary when it meets the criteria of the best management practices

22  and no practical alternative is reasonably available."  Wash. Admin. Code § 173-

23  430-040.  "Best management practices" are those practices for reducing air

24  contaminant emissions from agricultural activities as identified by a research task

25  force established by the State's Department of Ecology.  Wash.Rev.Code.

26  §§ 70.94.650(4).

27

28  BRIEF AMICUS CURIAE OF THE UNITED STATES - 26
     P00906pp.jsa

3. **The United States Takes No Position At This Time As To The Application of the Reasonable Modification Analysis To The Facts Of This Case**

"The determination of what constitutes reasonable modification is highly fact-specific, requiring case-by-case inquiry." <u>Crowder v. Kitagawa</u>, 81 F.3d 1480, 1486 (9th Cir. 1996). Given the early posture of the record, the scant evidence on possible modifications does not render feasible a fair and complete analysis at this point. The United States accordingly takes no position on the appropriateness of any proposed modifications. The United States may seek an opportunity to comment on any reasonable modifications suggested by the parties.

## CONCLUSION

The district court has jurisdiction to consider plaintiffs' ADA and RA claims. In determining an appropriate remedy, however, the Court should take into account the key features of the applicable statutory schemes in order to ensure that any remedy does not constitute a fundamental modification of those schemes.

DATED this 6th day of September 2000.

Respectfully submitted,

JAMES R. SHIVELY
United States Attorney

WILLIAM H. BEATTY
Assistant U. S. Attorney

LOIS J. SCHIFFER
Assistant Attorney General
Environment and Natural Resources Division

WILLIAM LANN LEE
Assistant Attorney General
Civil Rights Division

MARK GROSS
Civil Rights Division
R. JUSTIN SMITH
Environment and Natural Resources Division

BRIEF AMICUS CURIAE OF THE UNITED STATES - 27
P00906pp.jsa

OF COUNSEL:
    GARY S. GUZY
    ROBERT G. DREHER
    WENDY L. ADAMS
    CRAIG B. ANNEAR
    MICHAEL L. GOO
    Office of General Counsel
    U.S. Environmental Protection Agency
    Washington, DC 20460

BRIEF AMICUS CURIAE OF THE UNITED STATES - 28
P00906pp.jsa

1        I hereby declare under penalty of perjury, pursuant to 28 U.S.C. §1746, that

2    on this 6th day of September, 2000, I served a copy of **BRIEF AMICUS**

3    **CURIAE OF THE UNITED STATES** upon counsel, by placing said copy in a

4    prepaid envelope addressed to the persons hereinafter named at the places and

5    addresses below stated, which are the last known addresses, as she is informed and

6    believes, and by placing said envelopes and contents in the outgoing mail of the

7    Office of the United States Attorney for the Eastern District of Washington so the

8    same is deposited in the United States mail at Spokane, Washington, to:

9

10   Leslie Seffern
     Assistant Attorney General
     Office of the Attorney General
11   P.O. Box 40117
     Olympia, WA 98504-0117

12   Karen S. Lindholdt
13   Center for Justice
     423 West First St.
14   Suite 240
     Spokane, WA 99201